## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

---------------------------------------------------------------x

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| OFFICE PROPERTIES INCOME TRUST, *et al.*, | : | Case No. 25-90530 (CML) |
| | : | |
| Debtors.[1] | : | (Jointly Administered) |
| | : | |

---------------------------------------------------------- x

| | | |
|---|---|---|
| UMB BANK, NATIONAL ASSOCIATION, *in its Capacities as Indenture Trustee, Collateral Agent, and Controlling Junior Agent,* | : | |
| | : | |
| Plaintiff, | : | |
| v. | : | |
| | : | |
| HELIX PARTNERS MANAGEMENT, LP, REDWOOD CAPITAL MANAGEMENT LLC, OFFICE PROPERTIES INCOME TRUST, OPI NOTEX HOLDINGS TRUST, OPI NOTEX PROPERTIES LLC, 112 AVE MIAMI LLC, 3400 PLANO TX LLC, BURT STREET OMAHA LLC, CLAY ROAD HOUSTON LLC, ELLIOTT AVE SEATTLE LLC, JAN DAVIS HUNTSVILLE LLC, SCHROCK ROAD COLUMBUS LLC, OPI WF HOLDING LLC, OPI WF BORROWER LLC, OPI WF OWNER LLC, and 440 FIRST STREET LLC, | : | Adversary Proceeding No. |
| | : | |
| Defendants. | : | |

----------------------------------------------------------X

## ADVERSARY COMPLAINT

---

[1] A complete list of the Debtors in the Chapter 11 Cases may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/OPI. The Debtors' mailing address is Two Newton Place, 255 Washington Street, Suite 300, Newton, Massachusetts 02458-1634.

UMB Bank, N.A. (the "**Plaintiff**" or "**2027 Agent**"), solely in its capacities as Indenture Trustee and Collateral Agent for the 3.250% Senior Secured Notes due 2027 (the "**2027 Notes**"), under that certain Indenture dated December 11, 2024 (as subsequently amended, supplemented or modified from time to time, the "**2027 Indenture**"), and as Controlling Junior Agent under the Exchange Notes 1L/2L Subordination and Intercreditor Agreement dated December 11, 2024 (the "**Intercreditor Agreement**" or "**ICA**"), by and through its undersigned counsel, files this adversary complaint (the "**Complaint**") against Helix Partners Management, LP ("**Helix**"), Redwood Capital Management LLC ("**Redwood**" and together with Helix, the "**2029 Ad Hoc Steering Committee**"), and Debtors Office Properties Income Trust, OPI Notex Holdings Trust, OPI Notex Properties LLC, 112 Ave Miami LLC, 3400 Plano TX LLC, Burt Street Omaha LLC, Clay Road Houston LLC, Elliott Ave Seattle LLC, Jan Davis Huntsville LLC, Schrock Road Columbus LLC, OPI WF Holding LLC, OPI WF Borrower LLC, OPI WF Owner LLC, and 440 First Street LLC (the "**ICA Debtors**" and together with 2029 Ad Hoc Steering Committee, the "**Defendants**"), hereby alleges as follows:

## NATURE OF THE CASE

1.     This Adversary Proceeding seeks declaratory relief and damages arising from violations of the Intercreditor Agreement attached hereto as **Exhibit A**. The Intercreditor Agreement defines and delineates certain key rights and obligations among the ICA Debtors, 2027 Agent, holders of 2027 Notes (the "**2027 Holders**" and together with the 2027 Agent, the "**2027 Secured Parties**"), holders (the "**2029 Holders**") of certain notes due in September 2029 (the "**2029 Notes**"), and the indenture trustee, collateral agent, and administrative agent for the 2029 Notes (the "**2029 Agent**" and together with the 2029 Holders, the "**2029 Secured Parties**").

AFSDOCS:304684613.5

The 2027 Agent reserves all rights to amend this Complaint and relate back to the filing of this Complaint upon discovery of additional facts and information.

2.       By and through the Intercreditor Agreement, the ICA Debtors and 2029 Secured Parties, including the 2029 Ad Hoc Steering Committee, agreed the 2027 Secured Parties would be entitled to provide—***without interference or impediment by the 2029 Secured Parties***—debtor-in-possession financing secured by liens on "Independent Junior Collateral" (as defined in the ICA) and/or guaranteed by certain non-ICA Debtors (as defined below, the "***2027 Non-ICA Obligors***").   In derogation of this covenant, the ICA Debtors and 2029 Ad Hoc Steering Committee negotiated a Restructuring Support Agreement, attached hereto as **Exhibit B**, and 2029 DIP Credit Agreement, attached hereto as **Exhibit C**, which block, impede, and interfere with the 2027 Secured Parties' ability to provide debtor-in-possession financing to 2027 Non-ICA Obligors in these Chapter 11 Cases (defined below).

3.       The 2027 Agent seeks a judgment declaring that entry into the 2029 DIP Credit Agreement and Restructuring Support Agreement by the ICA Debtors and 2029 Ad Hoc Steering Committee violates the Intercreditor Agreement. The 2027 Agent has standing to enforce the Intercreditor Agreement, including all rights and protections thereunder negotiated for the benefit of the 2027 Secured Parties. There is an actual and immediate controversy arising from the hostile actions being taken in the Chapter 11 Cases by the ICA Debtors and 2029 Ad Hoc Steering Committee, who engineered the Restructuring Support Agreement and 2029 DIP Credit Agreement to impair the 2027 Secured Parties' rights, priority, and economic positions for the benefit of the 2029 Secured Parties.

4.       The 2027 Secured Parties entered the Chapter 11 Cases as structurally senior creditors of the 2027 Non-ICA Obligors (in relation to the 2029 Secured Parties) through

AFSDOCS:304684613.5

guaranties and the ability to provide secured financing to fund their postpetition operations. In accordance with the Intercreditor Agreement, an ad hoc group of 2027 Holders (the "***2027 Ad Hoc Group***") offered the 2027 Non-ICA Obligors postpetition financing on superior terms to the 2029 DIP Credit Agreement through the term sheet attached hereto as **Exhibit D** (the "***2027 Initial DIP Term Sheet***").  The 2027 Ad Hoc Group updated their proposal by and through the commitment letter and improved term sheet attached hereto as **Exhibit E** (the "***2027 Improved DIP Proposal***" and together with the 2027 Initial DIP Sheet, the "***2027 DIP Proposals***").

5.     The Restructuring Support Agreement and 2029 DIP Credit Agreement purport to grant certain 2029 Secured Parties the exclusive ability to provide secured postpetition financing to the 2027 Non-ICA Obligors—thereby blocking the 2027 DIP Proposals and leapfrogging the 2027 Secured Parties' structurally senior positions that the Intercreditor Agreement was specifically designed and negotiated to protect. The 2027 Agent requests a declaratory judgment that such transactions violate the Intercreditor Agreement.

6.     The 2029 Ad Hoc Steering Committee's actions in engineering the violation and breach of the Intercreditor Agreement for their own benefit will cause the 2027 Secured Parties extraordinary harm if permitted to proceed in the Chapter 11 Cases, including the diminution of the 2027 Secured Parties' security and economic position vis-à-vis the 2027 Non-ICA Obligors with respect to prepetition indebtedness and the loss of interest, fees, and, economic benefits associated with the right to provide postpetition financing.  The 2029 Ad Hoc Steering Committee should not be permitted to reap the benefits of their own inequitable conduct and breach of the implied covenant of good faith and plfair dealing on the backs of other creditors with enduring contractual rights.  Accordingly, the 2027 Agent seeks damages in an amount to be determined at trial.

## PARTIES

7.      Plaintiff UMB Bank, National Association is a national bank headquartered in Kansas City, Missouri, and the successor Indenture Trustee and Collateral Agent under the 2027 Indenture for the 2027 Notes, with a total face value of $444,992,000.

8.      Defendant and Debtor Office Properties Income Trust is a real estate investment trust formed under Maryland law and headquartered in Newton, Massachusetts.

9.      Defendant and Debtor OPI Notex Holdings Trust is a trust formed and organized under Maryland law, with a place of business in Massachusetts.

10.     Defendant and Debtor OPI Notex Properties LLC is a Maryland limited liability company, with a place of business in Massachusetts.

11.     Defendant and Debtor 112 Ave Miami LLC is a Delaware limited liability company, with a place of business in Massachusetts.

12.     Defendant and Debtor 3400 Plano TX LLC is a Delaware limited liability company, with a place of business in Massachusetts.

13.     Defendant and Debtor Burt Street Omaha LLC is a Delaware limited liability company, with a place of business in Massachusetts.

14.     Defendant and Debtor Clay Road Houston LLC is a Delaware limited liability company, with a place of business in Massachusetts.

15.     Defendant and Debtor is Elliott Ave Seattle LLC a Delaware limited liability company, with a place of business in Massachusetts.

16.     Defendant and Debtor Jan Davis Huntsville LLC is a Delaware limited liability company, with a place of business in Alabama.

AFSDOCS:304684613.5

17.     Defendant and Debtor Schrock Road Columbus LLC is a Delaware limited liability company, with a place of business Massachusetts.

18.     Defendant and Debtor OPI WF Holding LLC is a Delaware limited liability company located in the Commonwealth of Massachusetts.

19.     Defendant and Debtor OPI WF Borrower LLC is a Delaware limited liability company, with a place of business in Massachusetts.

20.     Defendant and Debtor OPI WF Owner LLC is a Delaware limited liability company, with a place of business in Massachusetts.

21.     Defendant and Debtor 440 First Street LLC is a Delaware limited liability company, with a place of business in Massachusetts.

22.     Upon information and belief, Defendant Helix Partners Management, LP is a Delaware limited partnership with its principal place of business in New York, NY.

23.     Upon information and belief, Defendant Redwood Capital Management LLC is a Delaware limited liability company with its principal place of business in New York, NY.

## JURISDICTION AND VENUE

24.     This Court has jurisdiction over this Adversary Proceeding, pursuant to 28 U.S.C. § 1334 and the *Amended Standing Order of Reference from the United States District Court for the Southern District of Texas*, dated May 24, 2012.

25.     This Court has personal jurisdiction over the Defendants, all of whom are actively participating in the Chapter 11 Cases before this Court. The exercise of personal jurisdiction over the Defendants is consistent with and within limits imposed by the United States Constitution.

26.     This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (D), (M), and (O) because the action arises under and relates to a case under chapter 11 of the Bankruptcy Code,

AFSDOCS:304684613.5

affects administration of the estate, and relates to the Debtors' procurement of postpetition financing, use of cash collateral, and adjustment of debtor-creditor relationships.

27.    Venue is proper in this United States Bankruptcy Cout for the Southern District of Texas under 28 U.S.C. §§ 1408 and 1409.

28.    This adversary proceeding is commenced pursuant to Rule 7001(a), (b), (g), (h), and (i) of the Federal Rules of Bankruptcy Procedure, which allows for proceedings to recover money or property, to subordinate liens and claims, and to obtain declaratory relief.

29.    Declaratory relief is appropriate pursuant to both Rule 7001 of the Bankruptcy Rules and 28 U.S.C. § 2201. The requested declaration is necessary to determine the parties' rights and aid efficient administration of the Chapter 11 Cases.

30.    Plaintiff confirms its consent (in its capacity as 2027 Agent), pursuant to Bankruptcy Rule 7008 and Rule 7008-1 of the Local Rules for the United States Bankruptcy Court for the Southern District of Texas (the "***Local Rules***"), to the entry of a final judgment or other final orders by the Court in connection with this Adversary Proceeding, to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

## FACTUAL BACKGROUND

### A.    Background of the Debtors and Intercreditor Agreement

31.    The Debtors are in the business of owning and leasing office and mixed-use properties across 29 states and the District of Columbia.

32.    The Debtors' organizational structure isolates commercial properties through separate ownership by distinct Debtor entities. Each Debtor entity generates its own lease income from its separately owned property, which is independent of income from property owned by

other Debtor entities. Similarly, each Debtor entity has its own capital expenditure needs, tax burdens, and other property-specific expenses.

33.     In 2024, the Debtors faced a confluence of financial challenges and approaching maturities on their funded debt obligations. To address these challenges and maturities, the Debtors engaged in a series of transactions with the 2027 Secured Parties, 2029 Secured Parties, and other lenders to avoid monetary defaults on funded debt obligations. These transactions in 2024 created "silos" of Debtor entities for purposes of collateralizing, securing, and protecting the rights of different lender constituencies. Each lender constituency received a tailored bundle of collateral and rights at certain entities, properties, and silos.

34.     The 2029 Secured Parties received first-priority lien rights on the property of ICA Debtors (i) OPI Notex Holdings Trust, (ii) OPI Notex Properties LLC, (iii) 112 Ave Miami LLC, (iv) 3400 Plano TX LLC, (v) Burt Street Omaha LLC, (vi) Clay Road Houston LLC, (vii) Elliott Ave Seattle LLC, (viii) Jan Davis Huntsville LLC, and (ix) Schrock Road Columbus LLC, whereas the 2027 Secured Parties received second-priority lien rights at those ICA Debtors.  In addition, the 2029 Secured Parties received second-priority lien rights on the property of ICA Debtors (x) OPI WF Holding LLC, (xi) OPI WF Borrower LLC, (xii) OPI WF Owner LLC, and (xiii) 440 First Street LLC, which are not obligors of the 2027 Secured Parties.

35.     Conversely, the 2027 Secured Parties received superior liens and structural seniority through guaranties at various non-ICA Debtors where the 2029 Secured Parties had no prepetition liens, rights, or claims. In order to coordinate the rights and obligations of the 2027 Secured Parties and 2029 Secured Parties at various silos and collateral, the 2027 Agent, 2029 Agent, and ICA Debtors entered into the Intercreditor Agreement.

36.     On October 30, 2025, Plaintiff became the successor 2027 Agent pursuant to that certain Instrument of Resignation, Appointment and Acceptance of the same date. At such time, Plaintiff also became the Controlling Junior Agent under the Intercreditor Agreement (as defined therein), with all powers and rights to enforce the Intercreditor Agreement pursuant to Section 3(j) thereof for the benefit of any and all 2027 Secured Parties.

37.     The Intercreditor Agreement, which is governed by New York law, applies to, benefits, and binds the ICA Debtors, all 2027 Secured Parties, and all 2029 Secured Parties, including the 2029 Ad Hoc Steering Committee.

38.     Section 14.01(f) of the Indentures between the Debtors and 2029 Agent states:

Each [of the 2029 Holders], by its acceptance of any Notes is deemed to have consented and agreed to the terms of each Security Document and Intercreditor Agreement, as originally in effect and as amended, supplemented or replaced from time to time in accordance with its terms or the terms of this Indenture; and authorizes and empowers the Trustee to bind the Holders as set forth in the applicable Security Documents and Intercreditor Agreements, if any, to which they are a party and to perform its obligations and exercise its rights and powers thereunder.

39.     Entities against whom both the 2027 Secured Parties and the 2029 Secured Partis have claims are defined as "Obligors" by the Intercreditor Agreement. **Ex. A**, Intercreditor Agreement § 1.

40.     Assets on which both the 2027 Notes and the 2029 Notes have liens are defined as "Collateral" by the Intercreditor Agreement. **Ex. A**, Intercreditor Agreement § 1.

41.     The Intercreditor Agreement recognizes that the 2027 Secured Parties: (i) hold guarantees by entities that are not shared "Obligors" with the 2029 Notes; and (ii) hold liens on assets that are not shared "Collateral" with the 2029 Notes. Each Debtor obligor in this category – i.e., a Debtor obligor of the 2027 Notes that was not also a prepetition obligor of the 2029 Notes – is, for purposes of this Adversary Proceeding, a "***2027 Non-ICA Obligor***."   The 2027

9

Non-ICA Obligors are listed, identified, and distinguished in the Organizational Charts attached as Exhibit B to the *Declaration of John R. Castellano in Support of Debtors' Chapter 11 Petitions and First Day Relief*. Chapter 11 Cases, Dkt. No. 26, pp. 148-159.

42. The Intercreditor Agreement provides the 2027 Holders with critical protections of their economic rights and security with respect to 2027 Non-ICA Obligors and non-overlapping collateral (defined in the Intercreditor Agreement as "***Independent Junior Collateral***"), including the right to provide debtor-in-possession financing to any non-shared Obligor free from any interference by the 2029 Holders.

43. Specifically, the Intercreditor Agreement provides, in relevant part, that:

"Notwithstanding anything to the contrary herein, ***the [2027] Secured Parties may provide, and no [2029] Secured Party*** shall contest***, interfere with, impede***, or object to, ***or join or otherwise support any other Person in*** contesting, ***interfering with, impeding*** or objecting to, ***any debtor-in-possession financing or use of cash collateral that is secured by Liens on Independent [2027 Notes] Collateral*** (and not any [Shared] Collateral), ***and/or guaranteed by Persons not constituting [Shared] Obligors, at any time***."

**Ex. A**, Intercreditor Agreement § 3(e) (emphasis added).

44. These rights and protections were (and are) critical for the 2027 Secured Parties in the event of a bankruptcy given the Debtors' outstanding liabilities in excess of $418 million on account of the 2027 Notes.

45. Each ICA Debtor is a party to and "agree[d] to be bound by the provisions hereof that are applicable to such [ICA Debtor]." **Ex. A**, Intercreditor Agreement § 11(j).

46. The ICA Debtors and 2029 Ad Hoc Steering Committee agreed that "[t]ime is of the essence in the performance of every covenant and agreement contained in this [Intercreditor] Agreement." **Ex. A**, Intercreditor Agreement § 11(g).

10

47.     Further, "[n]o failure or delay on the part of any party hereto in exercising any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right, power or remedy preclude any other or further exercise thereof or the exercise of any other right, power or remedy hereunder." **Ex. A**, Intercreditor Agreement § 7.

48.     The Intercreditor Agreement was expressly intended to "be effective before, during, and after the commencement of a Bankruptcy Proceeding . . . [and] the rights and obligations [t]hereunder of the [2029 Secured Parties] and the [2027 Secured Parties] shall be fully enforceable as between such parties regardless of the pendency of Bankruptcy Proceedings or any related limitations on the enforcement of this Agreement against such Obligor." **Ex. A**, Intercreditor Agreement § 11(t).

49.     On October 25, 2025, in accordance with the Intercreditor Agreement and in anticipation of the Chapter 11 Cases, the 2027 Ad Hoc Group presented to the 2027 Non-ICA Obligors the 2027 Initial DIP Term Sheet for postpetition financing attached hereto as **Exhibit D**.

### B.     The Chapter 11 Cases and Violation of the Intercreditor Agreement

50.     On October 30, 2025, following the Debtors' default and the acceleration of their obligations to the 2027 Secured Parties, the Debtors filed petitions for relief under chapter 11 of the Bankruptcy Code, commencing the above-captioned bankruptcy cases (the "***Chapter 11 Cases***").

51.     On the same date, the Debtors entered into a Restructuring Support Agreement (the "***Restructuring Support Agreement***" or "***RSA***") and Debtor-in-Possession Credit Agreement (the "***2029 DIP Credit Agreement***") with an ad hoc group of 2029 Holders (the "***2029 Ad Hoc Group***").  **Exs. B** and **C**, respectively.

11

52.     Defendants Helix and Redwood are members of the 2029 Ad Hoc Group and comprise the 2029 Ad Hoc Steering Committee.

53.     Upon information and belief, the 2029 Ad Hoc Steering Committee owns approximately two-thirds (62.98%) of the 2029 Notes in the 2029 Ad Hoc Group and a majority (50.46%) of all outstanding 2029 Notes.

54.     The 2029 DIP Credit Agreement has objectively inferior terms and consequences for the Debtors and their estates as compared to the 2027 Initial DIP Term Sheet, including:

| Terms | 2027 Initial DIP Term Sheet | 2029 DIP Credit Agreement |
|---|---|---|
| **Interest Rate** | 10.5%<br>(lower) | 12.0% |
| **Upfront Fees** | 1.0%<br>(lower) | 2.25% |
| **Backstop Premium** | 4.0%<br>(lower) | 10.0% |
| **Exit Premium** | 4.0%<br>(lower) | 5.75% |

In addition, the 2027 Initial DIP Term Sheet required narrower releases and stipulations in favor of lenders and provides more meaningful investigation budget for the official committee of unsecured creditors ($500,000 vs. $75,000).

55.     In the unlikely event the Debtors needed additional funding as contemplated by the 2029 DIP Credit Agreement, the 2027 Initial DIP Term Sheet could be upsized to $125 million.

56.     The 2027 Initial DIP Term Sheet would not be guaranteed by, or secured by the assets of, any Debtors other than the 2027 Non-ICA Obligors. It would also not subordinate those Debtors' current creditors or encumber their assets with joint and several obligations for the benefit of other Debtors' estates. Rather, the 2027 Initial DIP Term Sheet provided an

AFSDOCS:304684613.5

allocation methodology to ensure that applicable Debtor silos would be responsible for their fair portion of the cost of the Chapter 11 Cases.

57.     On January 19, 2026, the 2027 Ad Hoc Group offered the 2027 Improved DIP Proposal attached hereto as **Exhibit E**, adding even more attractive terms over the 2029 DIP Credit Agreement, including: (a) the option to equitize; and (b) an increased committee investigation budget of $1 million.  The 2027 Improved DIP Proposal remains open.

58.     The Restructuring Support Agreement and the 2029 DIP Credit Agreement would, in contrast, saddle the 2027 Non-ICA Obligors with joint and several liability for $125 million in financing, as well as the obligation to pay interest payments and fees as adequate protection to the 2029 Holders.

59.     Critically, the Restructuring Support Agreement and 2029 DIP Credit Agreement are also impeding and interfering with the 2027 Non-ICA Obligors' ability to accept superior financing terms from 2027 Ad Hoc Group under the 2027 DIP Proposals or otherwise.

60.     As of the Petition Date, the 2027 Non-ICA Obligors held valuable properties that were either: (a) subject to first liens of the 2027 Secured Parties; (b) subject to unsecured guaranties of the 2027 Secured Parties and no senior liens; or (c) subject to unsecured guaranties of the 2027 Secured Parties behind senior liens of creditors other than the 2029 Secured Parties. The 2029 Secured Parties had no claims at the 2027 Non-ICA Obligors.

61.     The ability to provide secured postpetition financing to 2027 Non-ICA Debtors with unsecured guarantees and preserve relative seniority as between the 2027 Secured Parties and 2029 Secured Parties was a critical protection negotiated into the Intercreditor Agreement.

AFSDOCS:304684613.5

62.     The 2029 DIP Credit Agreement expressly prohibits the Debtors, including the 2027 Non-ICA Obligors, from incurring new liens in favor of the 2027 Secured Parties. **Ex. C**, 2029 DIP Credit Agreement § 9.02.

63.     On November 5, 2025, the Bankruptcy Court approved the 2029 DIP Credit Agreement on an interim basis.  Chapter 11 Cases, Dkt. No. 150 (the "***Interim DIP Order***").

64.     The Interim DIP Order provides, pursuant to Section 510 of the Bankruptcy Code:

> *[The Intercreditor Agreement] between and/or among any March 2027 Notes Secured Party, any September 2029 Notes Secured Party, any Debtor or affiliate thereof*, and any other applicable intercreditor or subordination provisions contained in any credit agreement, security agreement, indenture or related document, *(i) shall remain in full force and effect, (ii) shall continue to govern the relative priorities, rights and remedies of the March 2027 Notes Secured Parties and the September 2029 Notes Secured Parties  . . . , and (iii) shall not be amended, altered or modified by the terms of this Interim Order or the DIP Documents*.

Interim DIP Order, ¶ I(i) (emphasis added).

65.     The Interim DIP Order also states, in relevant part, "any intercreditor, subordination or similar agreement in respect of the Prepetition Secured Obligations . . . are enforceable to the fullest extent provided by Section 510(a) of the Bankruptcy Code and applicable law."  Interim DIP Order, ¶ 18(h).

66.     Yet, as a direct result of the lien prohibition in the 2029 DIP Credit Agreement, the 2027 Secured Parties are precluded from providing secured postpetition financing to the 2027 Non-ICA Obligors.

67.     The Restructuring Support Agreement attempts to lock the Debtors into the 2029 DIP Credit Agreement by making the Debtors' failure to support, seek entry, or obtain approval of the 2029 DIP Credit Agreement a breach of the Restructuring Supporting Agreement. **Ex. B**, RSA, §§ 3.01(a), (c), (j)(v), & 4.01(a)(i).

14

68.     Put differently, the Restructuring Support Agreement is designed to trigger a breach if the Debtors attempt to allow the 2027 Secured Parties to provide secured postpetition financing to the 2027 Non-ICA Obligors.

69.     This intention is made clear by other terms of the Restructuring Support Agreement. Section 4.01(a) of Restructuring Support Agreement creates termination events upon (i) the Debtors announcing any intent to pursue an alternative transaction (which would include the 2027 DIP Proposals); and (ii) the incurrence of any indebtedness by the Debtors to third parties (including the 2027 Secured Parties). **Ex. B**, RSA, § 4.01(a)(ii) & (viii).

70.     A breach or termination event under the Restructuring Support Agreement is also an Event of Default under the 2029 DIP Credit Agreement, § 10.01(n)(xvi). Upon such an Event of Default, the 2029 DIP Credit Agreement grants the 2029 Ad Hoc Group substantial rights and remedies against the Debtors and their properties. **Ex. C**, 2029 DIP Credit Agreement, § 10.02.

71.     These and other provisions of the 2029 DIP Credit Agreement and Restructuring Support Agreement preclude the 2027 Non-ICA Obligors from accepting the 2027 DIP Proposals or any other secured postpetition financing from the 2027 Secured Parties.

72.     By entering into the 2029 DIP Credit Agreement and Restructuring Support Agreement, independently and cumulatively, the 2029 Ad Hoc Steering Committee is interfering with the 2027 Secured Parties' ability to provide secured postpetition financing to the 2027 Non-ICA Obligors.

73.     By entering into the 2029 DIP Credit Agreement and Restructuring Support Agreement, independently and cumulatively, the 2029 Ad Hoc Steering Committee is impeding the 2027 Secured Parties from providing secured postpetition financing to the 2027 Non-ICA Obligors.

AFSDOCS:304684613.5

74.     By entering into the 2029 DIP Credit Agreement and Restructuring Support Agreement, independently and cumulatively, the 2029 Ad Hoc Steering Committee is also joining or otherwise supporting the Debtors in impeding or interfering with the 2027 Secured Parties' ability to provide secured postpetition financing to the 2027 Non-ICA Obligors. In so doing, the 2029 Ad Hoc Steering Committee is violating section 3(e) of the Intercreditor Agreement.

75.     These violations of the Intercreditor Agreement are causing and, if the Restructuring Support Agreement and 2029 DIP Credit Agreement are approved by the Bankruptcy Court, will continue to cause substantial harm to the 2027 Secured Parties by preventing them from retaining their seniority as creditors of the 2027 Non-ICA Obligors and instead allowing the 2029 Ad Hoc Group to step ahead of them as senior creditors using $125 million of secured debt under the 2029 DIP Credit Agreement.  The 2027 Secured Parties will also be harmed by the loss of interest and fees associated with their bargained-for right to provide postpetition financing to the 2027 Non-ICA Obligors.

76.     These violations of the Intercreditor Agreement are also relevant to the ICA Debtors, who are parties to and agreed to be bound by the Intercreditor Agreement.

77.     The Debtors are actively seeking Bankruptcy Court approval of the 2029 DIP Credit Agreement in the Chapter 11 Cases. Chapter 11 Cases, Dkt. No. 32.

78.     The Debtors are also seeking Bankruptcy Court approval of the terms of the Restructuring Support Agreement by and through their efforts to obtain approval of the 2029 DIP Credit Agreement and Plan of Reorganization.  Chapter 11 Cases, Dkt. No. 575.

79.     The Bankruptcy Court has not yet approved the 2029 DIP Credit Agreement or Restructuring Support Agreement on a final basis.

AFSDOCS:304684613.5

80.     Upon information and belief, the Debtors and 2029 Ad Hoc Steering Committee disagree that entry into the Restructuring Support Agreement and 2029 DIP Credit Agreement is a violation of the Intercreditor Agreement.

81.     A ruling from this Court that the blocking provisions in the Restructuring Support Agreement and 2029 DIP Credit Agreement violate the Intercreditor Agreement is critical to the Debtors' exercise of their fiduciary obligations, including with respect to the consideration of appropriate case financing and the terms of their restructuring.

82.     The Debtors' participation in violations of the Intercreditor Agreement will create substantial administrative expense liabilities against their estates.   The 2027 Agent has filed claims for such administrative expenses against the Debtors' estates in unliquidated amounts, which are located on the Claims Register at Nos. 587, 612, 614-76, 678-81, 683-85, 688, 690 and 692, and incorporated herein by reference. If the Debtors proceed with the 2029 DIP Credit Agreement and Restructuring Support Agreement in present form, the administrative expense claims against their estates will be liquidated in substantial amounts.

## COUNT I
### (*Declaratory Judgment against all Defendants*)

83.     Plaintiff repeats and realleges, as if set forth fully herein, all other allegations of this Complaint as if fully restated herein.

84.     Pursuant to 28 U.S.C. §§ 2201 and 2202, this Court has the power to declare rights, status, and other legal relations between and among the parties, whether or not further relief is or could be sought.

85.     A real and justiciable controversy exists as to whether entry into the Restructuring Support Agreement and 2029 DIP Credit Agreement by the ICA Debtors, 2029 Ad Hoc Steering Committee, and other parties is a breach of the Intercreditor Agreement.

AFSDOCS:304684613.5

86.     The Intercreditor Agreement provides that the 2027 Secured Parties may provide debtor-in-possession financing to the 2027 Non-ICA Obligors. The 2027 Ad Hoc Group attempted to offer such financing through the 2027 DIP Proposals.

87.     The Restructuring Support Agreement and 2029 DIP Credit Agreement preclude the 2027 Non-ICA Obligors from accepting the 2027 DIP Proposals or any other debtor-in-possession financing from the 2027 Secured Parties.

88.     The ICA Debtors and 2029 Ad Hoc Steering Committee are parties to the Intercreditor Agreement, Restructuring Support Agreement, and 2029 DIP Credit Agreement.

89.     The 2027 Secured Parties have asserted that by entering into the Restructuring Support Agreement and 2029 DIP Creditor Agreement, the Debtors and 2029 Ad Hoc Group are violating the Intercreditor Agreement.

90.     Upon information and belief, the Debtors and 2029 Ad Hoc Group have denied that the Restructuring Support Agreement and 2029 DIP Credit Agreement violate the Intercreditor Agreement.

91.     The controversy is substantial, immediate, and real. The 2027 Secured Parties are owed in excess of $418 million by the Debtors. The Debtors and 2029 Ad Hoc Steering Committee are engaged in an active, ongoing, and hostile course of action to strip out and impair the 2027 Secured Parties' rights, protections, and interests through the Restructuring Support Agreement and 2029 DIP Credit Agreement in direct violation of the Intercreditor Agreement.

92.     The 2027 Agent and its constituents, the 2027 Ad Hoc Group, have each objected to the 2029 DIP Credit Agreement. Chapter 11 Cases, Dkt. Nos. 43, 75. As such the 2027 Agent is adverse to the ICA Debtors and 2029 Ad Hoc Steering Committee.

AFSDOCS:304684613.5

93. The Bankruptcy Court approved the DIP Credit Agreement on an interim basis, Chapter 11 Cases, Dkt. No. 150, but has not yet approved the Restructuring Support Agreement, 2029 DIP Credit Agreement, or violative relief requested therein, on a final basis.

94. The controversy immediately affects the rights of the 2027 Agent, ICA Debtors, 2029 Ad Hoc Steering Committee, and their respective constituents.

95. This controversy is of sufficient immediacy to warrant judicial relief under the Declaratory Judgment Act. 28 U.S.C. §§ 2201-2202. A timely declaration is necessary to resolve the controversy, assist the parties in clarifying and adjudicating critical rights and obligations related to the Chapter 11 Cases, and avoid the accrual of unnecessary damages, including but not limited substantial administrative claims against the Debtors.

96. Accordingly, the 2027 Agent requests a declaration that the ICA Debtors' entry into the Restructuring Support Agreement and/or 2029 DIP Credit Agreement, upon approval by the Bankruptcy Court, constitutes a violation of the Intercreditor Agreement.

## <u>COUNT II</u>
### (*Breach of Contract against Defendants Helix and Redwood*)

97. Plaintiff repeats and realleges, as if set forth fully herein, all other allegations of this Complaint as if fully restated herein.

98. The Intercreditor Agreement is a valid and enforceable contract governed by New York law.

99. The 2027 Agent, Helix, and Redwood are each party to the Intercreditor Agreement and have agreed to be bound by its terms.

100. The 2027 Agent, as Controlling Junior Agent under the Intercreditor Agreement, is entitled to enforce the Intercreditor Agreement for the benefit of all 2027 Secured Parties.

AFSDOCS:304684613.5

101.    Section 3(e) of the Intercreditor Agreement prohibits the 2029 Secured Parties from interfering with or impeding the 2027 Secured Parties provision' of debtor-in-possession financing to the 2027 Non-ICA Obligors.

102.    Section 3(e) of the Intercreditor Agreement also prohibits the 2029 Secured Parties from joining or supporting any other party in interfering with or impeding the 2027 Secured Parties' provision of debtor-in-possession financing to the 2027 Non-ICA Obligors.

103.    In addition, the Intercreditor Agreements contains an implied covenant of good faith and fair dealing.

104.    The implied covenant of good faith and fair dealing precludes any party to the Intercreditor Agreement from taking any action that will have the effect of destroying or injuring the right of the other party to receive the bargained-for fruits of the contract.

105.    Helix and Redwood are 2029 Secured Parties.

106.    Helix and Redwood, by and through their participation in the Restructuring Support Agreement and 2029 DIP Credit Agreement, are impeding the 2027 Secured Parties from providing debtor-in-possession financing to the 2027 Non-ICA Obligors.

107.    Helix and Redwood, by and through their participation in the Restructuring Support Agreement and 2029 DIP Credit Agreement, are interfering with the 2027 Secured Parties providing debtor-in-possession financing to the 2027 Non-ICA Obligors.

108.    Helix and Redwood, by and through their participation in the Restructuring Support Agreement and 2029 DIP Credit Agreement, are joining or supporting the Debtors in impeding or interfering with the 2027 Secured Parties provision of debtor-in-possession financing to the 2027 Non-ICA Obligors.

AFSDOCS:304684613.5

109.    Helix and Redwood, by and through their participation in the Restructuring Support Agreement and 2029 DIP Credit Agreement, are destroying or injuring the rights of the 2027 Secured Parties to receive the fruits of the Intercreditor Agreement.

110.    By and through the foregoing conduct, Helix and Redwood are in breach of the Intercreditor Agreement, including section 3(e).

111.    By and through the foregoing conduct, Helix and Redwood are in breach of the covenant of good faith and fair dealing in the Intercreditor Agreement.

112.    The 2027 Agent has complied with its obligations under the Intercreditor Agreement.

113.    The 2027 Agent is ready, willing, and able to continue performing its obligations under the Intercreditor Agreement.

114.    The foregoing breaches of contract by Helix and Redwood have caused and will continue to cause harm to the 2027 Secured Parties by preventing them from retaining their seniority as creditors of the 2027 Non-ICA Obligors and instead allowing the 2029 Ad Hoc Group to step ahead of them using $125 million of secured debt under the 2029 DIP Credit Agreement.

115.    The 2027 Secured Parties are also being harmed by the loss of interest and fees associated with their bargained-for right to provide postpetition financing to the 2027 Non-ICA Obligors.

116.    The 2027 Agent is entitled to and demands an award of damages for the harm caused by the 2029 Ad Hoc Steering Committee's breaches of the Intercreditor Agreement, including sections 3(e) and the covenant of good faith and fair dealing, in an amount to be determined at trial.

AFSDOCS:304684613.5

## PRAYER FOR RELIEF

Plaintiff demands judgment in its favor and against the Defendants, as follows:

A.     on Count I, declaring that Defendants' entry into the Restructuring Support Agreement, 2029 DIP Credit Agreement, and any related restrictions on the ability of the 2027 Secured Parties to offer debtor-in-possession financing to the 2027 Non-ICA Obligors violates the Intercreditor Agreement;

B.     on Count II, holding Defendants Helix and Redwood liable for their breaches of the Intercreditor Agreement and the covenant of good faith and fair dealing, and awarding damages in an amount to be determined at trial;

C.     awarding fees, costs, and pre- and post-judgment interest to the Plaintiff; and

D.     granting such other and further relief as this Court deems just and proper.

Dated:     January 24, 2026
          New York, New York           Respectfully submitted,

*/s/Andrew I. Silfen*
Andrew I. Silfen (NY Bar No. 2094076)
Beth M. Brownstein (NY Bar No. 4753638)
Nicholas A. Marten (NY Bar ID No. 5032545)
**ARENTFOX SCHIFF LLP**
1301 Avenue of the Americas, 42nd Floor
New York, NY 10019
Tel:    (212) 484-3900
Email: Andrew.Silfen@afslaw.com
        Beth.Brownstein@afslaw.com
        Nicholas.Marten@afslaw.com

- and -

Justin A. Kesselman (MA Bar ID No. 687793)
**ARENTFOX SCHIFF LLP**
800 Boylston Street, 32nd Floor
Boston, MA 02199
Tel:    (617) 973-6100
Email: Justin.Kesselman@afslaw.com

*Counsel for UMB Bank, N.A., Solely in its Capacities as Indenture Trustee and Collateral Agent under the 2027 Notes Indenture and Controlling Junior Agent under the Intercreditor Agreement*

AFSDOCS:304684613.5